# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| AMANDA WINGROVE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CASE NO.:  1:20-cv-3085 |
| | ) |
| ELWOOD COMMUNITY SCHOOLS | ) |
| BOARD OF TRUSTEES, | ) |
| | ) |
| and | ) |
| | ) |
| CASEY SMITHERMAN, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL

Plaintiff, AMANDA WINGROVE (hereinafter "Wingrove"), by counsel, files her Complaint for Damages and Request for Jury Trial against Defendants, Elwood Community Schools Board of Trustees (hereinafter "the Board") and Casey Smitherman in her official and individual capacities, as follows:

Wingrove brings her claim pursuant to the Civil Rights Act of 1871, *42 U.S.C. § 1983,* for violation of her due process rights guaranteed by the Fourteen Amendment.  Defendants denied Wingrove her substantive and procedural due process rights, under color of state law and authority, before terminating her employment.

### I.   JURISDICTION AND VENUE

1. The Court has jurisdiction to try the case and has personal jurisdiction over the parties because it involves federal law.

2. Wingrove is a United States Citizen and was at all relevant times residing in Madison County, Indiana.

3. Defendant, the Board, is the governing body of the Elwood Community Schools Corporation, which is a political subdivision of the state of Indiana and is based in Madison County, Indiana.

4. All actions which form the basis of Plaintiff's claims originated in Madison County, Indiana.

## II.     PARTIES

5. The Board of Trustees is the governing body of Elwood Community Schools.

6. Dr. Casey Smitherman (female), was at all relevant times, the Superintendent for Elwood Community Schools.

7. Plaintiff, Amanda Wingrove, was at all relevant times, a U.S. Citizen and resident of Elwood, Indiana.

## III.     SUPPORTING FACTS

8. Plaintiff incorporates by reference paragraphs 1 through 7 above.

9. In September 2012, the Board hired Wingrove as a support staff employee under the authority of its Policy No. 4120.

10. Soon thereafter, Wingrove was given the responsibility to operate and maintain the school's Auditorium and Natatorium.

11. Her duties included going into the girls locker room to ensure students were complying with school policy and rules such as cell phone usage and alerting contestants during swim meets and swim practice.

12. Wingrove performed her duties satisfactorily without complaints from school administration.

13. In or around February 2018, a student lodged a complaint to the school counselor and the assistant swim coach who, in turn, relayed the student's complaint to the school principal, David Retherford (hereinafter Retherford), against Wingrove.

14. The complaining student claimed that Wingrove had "peeked" into the bathroom stall the student was occupying at the time and that she felt "creeped out."

15. She also claimed that Wingrove had followed her into the bathroom a second time during a swim meet for purpose of viewing her while changing clothes, and that on one occasion, Wingrove had rubbed her shoulders during a swim meet but that she did not feel the rubbing was sexual in nature.

16. Retherford interviewed Wingrove and the complaining student.

17. Wingrove flatly denied she had "peeked" into the bathroom stall the student was using for any nefarious purpose. The student did not identify any witnesses for Retherford to question.

18. Retherford reported the student's complaint to the then-Superintendent Dr. Chris Daughtry (hereinafter Daughtry). Daughtry concluded that there was insufficient evidence that Wingrove had done anything inappropriate to warrant taking any action against her.

19. Daughtery and Retherford agreed that Retherford should simply alert Wingrove about the student's complaint and direct her to avoid contact with that student which Retherford promptly did.

20. Neither Dauthery nor Retherford, nor any other staff member to whom the student had reported the alleged incident reported the incident to the Indiana Department of Child Services.

21. Thereafter, Wingrove complied with Retherford's directive to avoid having any contact with the student.

22. In or around July 2018, a new Superintendent, Casey Smitherman (hereinafter Smitherman), took over as Superintendent of Elwood Community Schools.

23. Smitherman approached Retherford, telling him that a Board member had reported the student's complaint against Wingrove.

24. Retherford explained his and Daughtry's February 2018 decision not to take any formal action against Wingrove.

25. Smitherman asked Retherford to file a report of the student's allegation to the Indiana Department of Child Services which he did.

26. A DCS case worker informed Retherford that DCS would "screen out" the complaint, meaning that they would not be investigating the complaint.

27. Smitherman had the authority to refer Wingrove to the Board for termination proceedings in July 2018 but did not do so.

28. Instead, after DCS issued its report that it declined to investigate the student's complaint, Smitherman assigned Wingrove additional duties beyond her duties as operational manager of the auditorium and natatorium.

29. After she had graduated from Elwood High School, on or about December 13, 2108, the complaining student, appeared before the Elwood Community School Corporation ("ECSC") School Board ("Board"), the governing body for ECSC, at a public board meeting and requested to speak regarding a school teacher that Superintendent Smitherman had fired.

30. The Board had no prior knowledge of the subject matter the complaining student requested to talk about nor was the student on the agenda as a speaker.

31. The student had no official business with the Board since she had already graduated nor was she a scheduled or invited speaker.

32. In the course of discussing her disagreement with the Superintendent's decision to fire the teacher the student was supporting, the student told the Board and Smitherman, in the presence of members of the public, that a school faculty member had sexually harassed her in the girls locker room by peeping at her while in the bathroom stall and by rubbing her shoulders during a swim meet.

33. The student also questioned the Board rhetorically why Ms. Wingrove was still working for the school whereas the teacher the student liked was losing her job.

34. The complaining student knew her allegations of sexual harassment, voyeurism, and "stalking" were false and cast Wingrove in a false light.

35. During the same Board meeting, a friend of the complaining student also made false allegations to the Board and Smitherman and in the presence of the public who were attending the Board meeting, that Wingrove was ogling her while she was changing clothes in the girls locker room.

36. The complaining student's friend knew at the time she made the allegation that it was false and cast Wingrove in a false light.

37. The day after the complaining student and her friend spoke in front of the Board, on December 14, 2018, Superintendent Smitherman, without obtaining prior authorization from the Board, fired Wingrove based upon the complaining student's and her friend's allegations to the Board the evening before.

38. The Board took no formal action in accordance with its Policy No. 4140 to commence termination action against Wingrove.

39. On January 7, 2019, the Board formally approved Smitherman's termination of Wingrove.

## IV.   COUNT I. Section 1983

### (Fourteenth Amendment, Due Process – Liberty Interest)

40. Plaintiff incorporates by reference paragraphs 1 through 40 above.

41. Because Smitherman fired Wingrove for reasons which adversely affected Wingrove's good name and reputation, her Constitutional liberty interests were at stake.

42. Because Smitherman and the Board fired Wingrove based on student allegations of "peeping", Wingrove was entitled to due process to protect her liberty interests under the Fourteenth Amendment of the U.S. Constitution.

43. Smitherman, in her individual and official capacities, and the Board, acting under color of state authority and law, violated Wingrove's due process rights by not affording her a hearing before terminating her and affording her a chance to clear her good name.

44. Wingrove suffered damages resulting from Smitherman's and the Board's violation of Wingrove's Fourteenth Amendment due process rights.

## V. COUNT II. Section 1983

### (Fourteenth Amendment, Due Process - Property Interest)

45. Wingrove had an employment contract with ECS which assured support staff employees procedural due process rights if the employer initiated termination proceedings against the employee.

46. As such, Wingrove had a property interest in her employment as recognized by the Supreme Court in *Board of Regents v. Roth* (1962).

47. As an employee of a public school corporation, Wingrove had a right to procedural due process to protect her property rights under the Fourteenth Amendment.

48. During her employment with Elwood Community Schools, Wingrove was classified as a "support staff member."

49. The Elwood Community School Corporation Bylaws and Policies explicitly state that a support staff member may be terminated, upon a majority vote of the School Board, for violation of the policies of the Board or for any reasons not otherwise prohibited by law… and in such cases, the Board "shall provide the employee any required procedural due process and shall abide by such terms as may be set forth in a negotiated agreement.

50. The "required due process" includes notice of the intent to terminate her employment and an opportunity to be heard by a neutral third party to refute any allegations supporting the recommendation for termination before terminating her.

51. On December 14, 2018, Superintendent Smitherman told Wingrove that she was firing Wingrove based upon the two students' allegations made to the Board the evening before.

52. However, prior to Smitherman's termination if Wingrove in December 2018, Smitherman had received notice of the same allegations against Wingrove and had done nothing.

53. Only after the public report in front of the school Board by the two students in question did Smitherman terminate Wingrove which was subsequently ratified by the Board in January 2019 upon the recommendation of Smitherman.

54. Smitherman, acting under color of state law and authority, intentionally and with malice, deprived Wingrove of her due process rights under the Fourteenth Amendment.

55. The Board knew or should have known that Smitherman had violated Wingroves's due process rights but approved Smitherman's decision to fire Wingrove without affording Wingrove her due process rights.

56. In approving Wingrove's termination without due process, the Board also violated Wingrove's due process rights under the Fourteenth Amendment.

57. Wingrove had a right to procedural due process, including notice, opportunity for a hearing, confrontation and cross-examination of her accusers, discovery, basis of decision, and availability of counsel, before being terminated by Smitherman and the ECS School Board.

58. Smitherman and the Board violated Wingrove's Fourteenth Amendment right to procedural due process when they terminated her without notice of the basis for her termination and without a hearing.

**RELIEF**

WHEREFORE, Plaintiff requests judgment in her favor against Defendants and that the following be awarded:

a.  Damages, including back pay, front pay, with interest, compensatory damages resulting from Defendants' denial of procedural due process under the Fourteenth Amendment;

b.  Punitive damages against Smitherman in her individual capacity for her reckless disregard for Wingrove's Constutional rights and intentional misconduct against Wingrove;

c.  the costs of this action including reasonable attorney's fees;

d.  injunctive relief in the form of job reinstatement and restoration of all employment related benefits with no loss of seniority;

e.  any other such relief as the Court may deem just, proper, and equitable; and,

f.  any relief as the Court deems necessary and proper in the public interest.

## DEMAND FOR JURY TRIAL

Wingrove demands trial by jury on all issues and questions so triable.

Respectfully submitted,

*/s/ Tae Sture*
Tae Sture, Attorney No. 25120-29
Sture Legal Services, LLC
155 East Market Street, Suite 501
Indianapolis, IN  46204
Ph:  (317)577-9090
Fax:  (317)577-1102
Email:  tae@sturelaw.com